UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

    Plaintiff,

v.                                       Case No. 8:18–cv–2055–CPT

CIGAR CITY MOTORS, INC., et al.,

    Defendants.

_____/

## O R D E R

Before the Court are Defendants Cigar City Motors, Inc., Tallahassee CCM, LLC, Gulf Coast CCM, Inc., and Panama City Beach Cycles, LLC's (collectively, Cigar City) renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) (Doc. 166) and Plaintiff Equal Employment Opportunity Commission's (EEOC) post-trial motion for injunctive relief (Doc. 156). The Court conducted hearings on these motions and sought supplemental briefing from the parties relative to the EEOC's request for injunctive relief. (Docs. 192, 201–203). Upon careful review of the parties' submissions and for the reasons set forth below, Cigar City's renewed motion for judgment as a matter of law is denied and the EEOC's motion for injunctive relief is granted in part and denied in part.

I.

This case stems from a decision made by Cigar City in April 2015 not to promote one of its employees, Virginia Duncan, to the position of General Manager (GM) at its Harley-Davidson dealership in Tampa, Florida.  In its operative complaint, the EEOC averred that Cigar City engaged in this adverse employment action based on Duncan's sex in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2.  (Doc. 19).  To address this alleged conduct, the EEOC sought damages, as well as declaratory and injunctive relief.  *Id*.

At the close of discovery, Cigar City filed a motion for summary judgment (Docs. 49, 58, 64), which the Court denied (Doc. 85).  The case thereafter proceeded to a jury trial that lasted seven days.  (Docs. 163, 169, 175–78, 185).  Counsel for both sides—Beatriz Andre and Brandi Meredith for the EEOC and Thomas Gonzalez and Jake Proudfoot for Cigar City—were well-prepared throughout the trial and represented their respective clients with the highest degree of professionalism.

During the course of the trial, the parties introduced numerous exhibits and elicited testimony from multiple witnesses, including Duncan.  *Id*.  That evidence, viewed in the light most favorable to the EEOC and construing all reasonable inferences in its favor, revealed the following.

At all times relevant to this case, Cigar City operated Harley-Davidson dealerships in five Florida cities: Tampa, Brandon, New Port Richey, Tallahassee, and

Panama City Beach.[1]  (Doc. 185 at 53).   Cigar City's Vice-President, Gary Bang, oversaw the operations of these five dealerships and had the sole authority to hire the GM for each location.  (Doc. 178 at 119; Doc. 185 at 53).  Cigar City did not internally advertise or post announcements for its GM vacancies (Doc. 178 at 119) but did at times utilize a mentoring program to assist participants in the program in securing these positions.  (Doc. 163 at 231; Doc. 178 at 165–67).  Bang himself eschewed any formal process for selecting GMs, electing instead simply to identify those individuals he thought could fill the role and then choosing one of them for the job.  (Doc. 178 at 190–92).

Bang did, however, consider a number of criteria in picking GMs.  These criteria included the individual's experience in sales, which Bang believed to be essential, along with the individual's familiarity with all major departments of a Harley–Davidson dealership, which Bang preferred but did not require.  *Id*. at 120–21.  He also favored candidates who were already employed at the company, especially those who were working at the dealership with the GM vacancy.  *Id*. at 121–22.  In the end, most of the GMs Bang selected had previously served as General Sales Managers—which was the position immediately under the GM slot—before becoming GMs.  *Id*. at 123–24.  That said, Bang never promoted any females to the GM position irrespective of

---

[1] The parties described the Panama City Beach dealership on occasion as the Panama City dealership. The Court will refer to it as the Panama City Beach dealership for the sake of consistency.

whether they had been a General Sales Manager until after the EEOC filed the instant lawsuit.  *Id.* at 196–98, 201–202.

Prior to being employed by Cigar City, Duncan held a number of jobs in the motor vehicle industry.  For roughly a year, she owned and operated an aftermarket store that repaired Harley–Davidson motorcycles and sold both parts and apparel. (Doc. 176 at 230–32).  After this position, Duncan worked in various departments at a small Harley–Davidson dealership in Augusta, Georgia, ultimately becoming its GM.  *Id.* at 232–34.  For the next ten years, Duncan served in several capacities at a large car dealership and, in the two or three years immediately before joining Cigar City, was the General Sales Manager at a Harley–Davidson dealership in Whitfield, Virginia, a Financing and Insurance (F&I) Manager at a Harley-Davidson dealership in Melbourne, Florida, and, later, a Sales Manager at the same Melbourne dealership. *Id.* at 235–43.

Duncan was hired by Cigar City in 2012 and was assigned to its New Port Richey location, where she co–managed the F&I and Sales departments with Scott Pilman.   *Id.* at 245–49.  Ken Edwards, a former colleague of Duncan's who was selected to be the GM at the New Port Richey store, recommended that Cigar City bring Duncan on board.  *Id.* at 245–46.

Duncan made her interest in the GM position known to Cigar City's upper management early on in her employment there.  (Doc. 163 at 102–103).  During her tenure at the New Port Richey dealership, for example, Duncan began participating in

4

the company's GM training program, which had participants engage in monthly mentoring sessions with Bang. (Doc. 177 at 39).

When Edwards stepped down from his post as the New Port Richey GM, Cigar City chose Pilman to take his place. *Id*. at 53–54. Duncan testified that Cigar City did so despite Edwards recommending that she succeed him. *Id*. at 53. Also around this time, the General Sales Manager at the Brandon location, Robert Hammers, was promoted to be the GM at that dealership. (Doc. 176 at 64–67; Doc. 185 at 54).

Duncan eventually became the General Sales Manager of the Tampa store, where she reported to the dealership's GM, Mike Rendine. (Doc. 177 at 54–56). Rendine subsequently departed that location and was replaced by Patrick Hunt, who had been the GM at the Tallahassee store. *Id*. at 61, 77–78; (Doc. 178 at 266).

About nine months after Hunt became the Tampa GM, Cigar City asked him to resume being the GM at the Tallahassee location, thereby creating a GM vacancy at the Tampa dealership. (Doc. 177 at 77–78). Hunt—like his predecessor, Edwards—recommended that Duncan fill this spot. (Doc. 178 at 271).

Before Cigar City chose Hunt's permanent successor in Tampa, it requested that Gary Postle serve as the store's interim GM. *Id*. at 76–79. Postle's title with Cigar City was Executive Manager, and one of his functions was to provide training both to new hires and to existing employees who were transitioning into new positions. (Doc. 176 at 74). While the interim GM in Tampa, Postle was asked by Bang to train

5

Duncan and also to assess whether she was ready to become the full-time GM at that location.  (Doc. 178 at 165).

Throughout her evaluation period, Duncan continued to perform her duties as General Sales Manager and shadowed Postle as well.  (Doc. 177 at 80–89).  After a few months had passed, Postle told Bang that he did not believe Duncan was ready to assume the role of GM.  (Doc. 163 at 240).  Although Bang tasked Postle with offering such a recommendation, the final decision as to whether Duncan was to be promoted rested with Bang.  (Doc. 178 at 154–55).  Cigar City then chose Steven Snell, who was the Sales Manager at the Brandon dealership at the time, to replace Hunt as the Tampa GM.  (Doc. 176 at 130–32; Doc. 185 at 55).  Snell testified that he did not want this position but felt pressured to accept it in order to remain at the company.  *Id.* at 166–67.  Duncan resigned shortly thereafter.  (Doc. 177 at 92).

At the close of the evidence, each side orally moved for a judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) (Docs. 146, 147), and the Court reserved ruling on those motions.  After a period of deliberation, the jury returned a verdict in favor of the EEOC on the issue of liability and awarded it $500,000 in punitive damages but no compensatory relief.  (Doc. 145; Doc. 169 at 6–7).  The Clerk of Court entered a judgment reflecting the jury's verdict several weeks later.  (Doc. 154).  The instant motions followed.

II.

The Court commences its analysis with Cigar City's motion for judgment as a matter of law pursuant to Rule 50(b).  (Doc. 166).  In support of that motion, Cigar City contends that neither the jury's liability finding nor the jury's punitive damages award is adequately substantiated by the record.  *Id.*  The Court will consider each of these contentions in turn.

A.

Title VII generally prohibits an employer from discriminating against its employees because of their sex.  42 U.S.C. § 2000e–2(a)(1).  An employer is deemed to engage in such prohibited conduct when sex "was a motivating factor for [an] employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e–2(m).

Intentional employment discrimination can be proven in one of three ways: (1) by presenting direct evidence of discriminatory intent; (2) by satisfying the burden–shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) by producing a "convincing mosaic" of circumstantial evidence warranting an inference of intentional discrimination.  *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019) (en banc) (citation omitted).

"Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 926 (11th Cir. 2013) (per curiam) (citation

omitted);[2] *see also E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000) (same) (citation omitted).  The Eleventh Circuit has observed that "[o]nly the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012) (citation omitted).

If a plaintiff provides direct evidence of discrimination, the employer must show "by a preponderance of the evidence that the same employment decision would have been reached in the absence of the discriminatory motive." *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1518 (11th Cir. 1990) (citations omitted); *see also Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (per curiam) (same) (citation omitted).  "Production of nondiscriminatory reasons is not enough in a direct evidence case," however.  *Burns*, 908 F.2d at 1518 (citation omitted).  Instead, the employer "must prove that there was a gender-neutral reason for its employment decision."  *Id.*; *see also Harris v. M.C. Dean, Inc.*, 2017 WL 11072170, at *3 (M.D. Fla. Dec. 28, 2017) ("If the plaintiff proves through direct evidence that an illegal motive was a significant or substantial factor in an employment decision[,] the defendant can rebut the inference of discrimination 'only by proving by a preponderance of the evidence that the same decision would have been reached even absent the presence of

---

[2] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

that factor.'") (quoting *Kincaid v. Bd. of Trs.*, 188 F. App'x 810, 815–16 (11th Cir. 2006)).

When proceeding under the *McDonnell Douglas* burden shifting framework, a plaintiff must first establish a *prima facie* case of discrimination. *Lewis*, 918 F.3d at 1220–21 (citation omitted). The elements of a *prima facie* case for a failure to promote claim—such as the one at issue here—are: (1) the plaintiff was a member of a protected class; (2) the plaintiff "was qualified for and applied for a position the employer was looking to fill;" (3) the plaintiff was rejected despite her qualifications; and (4) the position was given to an individual outside of the plaintiff's protected class. *U.S. E.E.O.C. v. Mallinckrodt, Inc.*, 590 F. Supp. 2d 1371, 1377 (M.D. Fla. 2008) (citing *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005)). If a plaintiff satisfies these criteria, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221 (citation omitted). If the defendant crosses this threshold, the burden then shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination." *Id.* (citation omitted). To show pretext, a plaintiff must "produce sufficient evidence to allow a reasonable finder of fact to conclude that the . . . articulated reasons were not believable." *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citation omitted). A plaintiff can do this "by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered explanation." *Id.* (internal quotation marks and

citation omitted).  An employer's reason is not a pretext for discrimination, however, "'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'"  *Id.* (citation omitted).

A plaintiff seeking to show a "convincing mosaic" of circumstantial evidence may do so by tendering testimony and exhibits that demonstrate, among other things (1) "suspicious timing, ambiguous statements[,] and other bits and pieces from which an inference of discriminatory intent might be drawn;" (2) "systematically better treatment of similarly situated employees;" and (3) "the employer's justification [was] pretextual."  *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (internal quotation marks and citation omitted).

Where, as here, a court is presented with a post-trial motion for judgment as a matter of law under Rule 50(b), the details of these analytical approaches become less pertinent.  Indeed, when a disparate treatment lawsuit like this action is fully tried, a court reviewing the verdict "should proceed directly to the 'ultimate question' in the case: 'whether the defendant intentionally discriminated against the plaintiff.'"  *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1129 (11th Cir. 1984) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714–15 (1983)); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 153 (2000) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."); *Holland*, 677 F.3d at 1057 (citing *Carmichael*, 738 F.2d at 1129).  When answering this question:

10

> Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

At the end of the day, a party endeavoring to overturn a jury verdict bears a heavy burden. In short, "[j]udgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *E.E.O.C. v. Exel, Inc.*, 884 F.3d 1326, 1329 (11th Cir. 2018) (internal quotation marks and citation omitted). In applying this test, a court must view "all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *Id.* (citation omitted). This means that while "the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 135. Stated differently, a court should credit the evidence favoring the nonmovant and should only credit that "evidence supporting the moving party [which] is uncontradicted and unimpeached, at least to the extent that [such] evidence comes from disinterested witnesses." *Id.* at 151 (citation and internal quotation marks omitted).

Against this backdrop, the Court turns to Cigar City's claim that there is not enough evidence to buttress the jury's liability finding. To bolster this claim, Cigar

11

City argues at the outset that the evidence demonstrates Duncan was not promoted to GM of the Tampa dealership for legitimate, non-discriminatory reasons.  (Doc. 166).  This assertion does not survive scrutiny.

It is well settled that a defendant, like Cigar City, may offer an objective or subjective reason for not promoting a plaintiff.  *Chapman v. Al Transport*, 229 F.3d 1012, 1033–34 (11th Cir. 2000) (collecting cases).   It has also long been established that a plaintiff responding to such a reason cannot simply "recast" it or "substitute [its] business judgment for that of the employer," but must instead "meet th[e proffered] reason head on and rebut it."  *Id.* at 1030 (citations omitted).  Importantly, however, to afford a plaintiff "a full and fair opportunity to demonstrate pretext" in this context, the "defendant's explanation of its legitimate reason[ ] must be clear and reasonably specific."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) (internal quotation marks and citations omitted); *see also Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. (IMPACT) v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) ("A mere statement that the employer hired the best qualified person leaves no opportunity for the employee to rebut the given reason as a pretext, which the employee must do if a proper reason is articulated.").

In this case, Cigar City insists that its decision not to advance Duncan was because Postle concluded as a result of his training period with Duncan that she was "not ready."  (Doc. 163 at 240); (Doc. 166 at 14) ("Postle and Bang believed Duncan

was not ready to be a GM yet.").[3]  Postle testified in this regard that he told Bang that Duncan's "organizational skills were good but [that he] had some concern about some of the leadership aspects of [her] being the senior leader of a dealership."  (Doc. 163 at 240).

The problem with Cigar City's proffered explanation is that it does not include adequate factual details substantiating its determination that Duncan was not prepared to be a GM.  (Doc. 166 at 14–18).  Without factual examples bolstering this assessment, it is unclear how Duncan could fairly refute Cigar City's subjective determination of readiness.  *See Willis v. Koch Agronomic Servs., LLC*, 846 F. App'x 787, 795–96 (11th Cir. 2021) (noting that an employer was required to set forth factual examples to support its subjective opinion that an employee was terminated due to "lack of leadership").  Thus, as a threshold matter, Cigar City's own characterization of its claimed justification for not promoting Duncan lacks the type of specificity necessary for Duncan to rebut it.  *Burdine*, 450 U.S. at 258.

Despite this deficiency, the EEOC attempts to respond to Cigar City's purported rationale by focusing on the only two factual predicates Postle offered to buttress his assertion that Duncan was not ready—namely, that she supposedly did not discipline her subordinates enough and spent too much time in her office.  (Doc. 166 at 14–17).

---

[3] Defense counsel made the same argument in orally moving for judgment as a matter of law at the close of the EEOC's case, asserting that "the evidence is clear that the only reason given . . . why . . . Duncan was not promoted to the Tampa dealership [GM] position was because she was considered not ready."  (Doc. 185 at 69).

13

Although not expressly adopting these criticisms as the grounds for its decision not to advance Duncan, Cigar City nonetheless maintains that the EEOC fails to discredit them. *Id*. This line of argument by Cigar City is unpersuasive.

By the Court's lights, a reasonable jury could conclude that these alleged reasons provided by Postle as to why Duncan was not elevated were, in fact, a pretext for sex discrimination. There is evidence in the record that a male supervisor at Cigar City—Robert Hammers—was identified during his training period with Postle as possessing the same faults as Duncan was claimed to have and yet was still promoted to GM. There is also evidence that two other upper level male employees at Cigar City—Patrick Hunt and Steven Snell—had a management style similar to Duncan's but were likewise selected to be GMs.

With respect to Hammers, as noted previously, he was awarded the GM slot at the Brandon location during Duncan's tenure at Cigar City. (Doc. 176 at 64–67; Doc. 185 at 54). Hammers testified that when Postle was training him for the GM position, Postle told him that he spent "too much time in [his] office" and that his "management style" was "too laid back," was not "aggressive enough," and should be "a little bit more strict." (Doc. 176 at 79–83). Hammers further testified that he told Postle that his management style "was never going to change" and that even Postle came to realize a GM did not "have time to leave [his or her] office and go out and do other things a lot during the day." *Id*. A reasonable jury could find from this testimony that Postle levied the same type of criticisms at a male trainee, Hammers, as he did at

14

Duncan, that Hammers essentially brushed off those criticisms, and that Hammers was still promoted to the GM position at the end of his training period.

As for Hunt and Snell, Hunt testified that when he was a Sales Manager at Cigar City, he did not issue any disciplinary notices. (Doc. 178 at 259). Hunt explained that this was due to his "management style," which he advised was based upon his belief that "support and encouragement yield[ed] better results." *Id.* at 259–60. He also testified that Cigar City never asked him to modify the manner in which he supervised the employees in his charge. *Id.* Snell largely offered similar testimony, explaining that his approach to overseeing his subordinates consisted of "coaching and cheering [them] on and being there to help them and [to] assist them in achieving their goals." (Doc. 176 at 165). A reasonable jury could conclude from this evidence that two additional male Cigar City supervisors with a management style akin to that utilized by Duncan were promoted to GM while Duncan was not.

Cigar City's efforts to blunt this proof are unavailing. Although conceding that Hammers, Hunt, and Snell "testified to having the same management style as Duncan," Cigar City argues that two of the three were not successful GMs. (Doc. 171 at 4 n.1). This response misses the point. Whether Cigar City made sound business decisions in selecting their GMs is of little moment, as Cigar City highlights elsewhere in its briefing. It may be that Cigar City would have been wise to avoid choosing any GMs who were not disciplinarians. What is pertinent here is that if Cigar City advanced men with a certain management style to the GM position while refusing to

do the same with a woman with that same management style—and, as just discussed, there is evidence in the record to bolster such a finding—a reasonable jury could view that as a strong indicator of sex discrimination.

Cigar City next contends that Duncan fails to demonstrate—as she must—not only that Cigar City's proffered justification for refusing to promote her was false, but that "discrimination was the real reason." (Doc. 166 at 2–3) (quoting *Brooks*, 446 F.3d at 1163). It is true in this respect that the Supreme Court has recognized the distinction between deceitful and discriminatory behavior, stating that proof a "defendant's explanation is unworthy of credence is simply one form of circumstantial evidence [which] is probative of intentional discrimination"—evidence that "may be quite persuasive" but will not "*always* be adequate to sustain a jury's finding of liability." *Reeves*, 530 U.S. at 147–48.

That said, the Supreme Court has also made clear that the significance of showing the falsity of an employer's proffered reason for its adverse employment action should not be minimized.

> In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

*Id.* at 147 (citations and internal quotation marks omitted).  Indeed, the Supreme has held that when a *prima facie* case of employment discrimination is "combined with sufficient evidence to find that the employer's asserted justification is false," this pairing can be enough to "permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id.* at 148.

Here, Cigar City acknowledges that Duncan made a threshold showing of employment discrimination.  (Doc. 49 at 22).  And, as referenced above, a reasonable jury could find that Cigar City's proffered rationale for not elevating Duncan was false, insofar as three men—Hammers, Hunt, and Snell—were all promoted to GM, while a woman—Duncan—was not, despite evidence showing that Duncan shared the same managerial style and in-office work habits as her male counterparts.

This, therefore, may well be a case where a *prima facie* showing of employment discrimination coupled with adequate "evidence to find that the employer's asserted justification [was] false" are enough to sustain the jury's liability finding.  *Reeves*, 530 U.S. at 148.  After all, this is not a situation where the record "conclusively reveal[s]" a "nondiscriminatory reason for the employer's decision," or where a plaintiff has "created only a weak issue of fact as to whether the employer's reason was untrue" and there is "abundant and uncontroverted independent evidence that no discrimination" occurred.  *Reeves*, 530 U.S. at 148; *see also Fisher v. Vassar Coll.*, 114 F.3d 1332, 1338 (2d Cir. 1997) ("[I]f the circumstances show that the defendant gave

the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent.") (quoted by *Reeves*, 530 U.S. at 148).

The Court, however, need not decide the question of whether this is one of the instances where "a *prima facie* case and sufficient evidence to reject the employer's explanation . . . permit a finding of liability." *Reeves*, 530 U.S. at 149. This is because the EEOC has tendered what a reasonable jury could deem to be further evidence of discrimination. Much of that evidence can be grouped into three categories: (1) comments made by Bang and Postle; (2) a comparison of Duncan and Snell as GM candidates; and (3) Bang and Postle's credibility.

Before addressing the first of these categories, it is worth pausing to articulate why Postle's remarks are relevant. As described above, although Bang made the final decision about Duncan's promotion to the Tampa GM position, he asked Postle to evaluate Duncan and make a recommendation on the matter. A reasonable jury could conclude from this evidence that Postle was an "integral part" of the process used to determine whether to advance Duncan, and that if Postle had "a discriminatory animus" against Duncan because of her sex, this animus "tainted" the promotion process. *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).

There is evidence that both Bang and Postle made remarks to the effect that Duncan was not suitable for the GM job because she was "motherly." Hammers testified, for example, that Bang told him Duncan "is not going to be a [GM]" because "I need a manager, not a mother figure." (Doc. 176 at 91–92). Hammers also testified

that Postle told him Duncan "won't be a GM[, a]nother motherly figure I don't need." *Id*. Consistent with this evidence that Postle harbored a dismissive attitude towards Duncan, Hammers testified—without objection—that, in his opinion, Postle "had a problem with women in general in charge of anything." *Id*. at 142.

This testimony by Hammers cohered with that provided by Denise Presley, who worked for Harley-Davidson's bank for more than twenty years and served as a liaison between the bank and certain Harley–Davidson dealerships. (Doc. 177 at 175–76, 198–99). In light of Presley's interactions with these dealerships and their employees, Cigar City would sometimes ask Presley for her thoughts on potential hires and promotions. *Id*. at 192. Presley was familiar with Duncan and told Bang and Postle in separate conversations that Cigar City should award the Tampa GM spot to her. *Id*. at 182–92. Presley testified that when Postle informed her that Cigar City had not done so, she asked why and was advised by Postle that Bang felt Duncan "was too motherly." *Id*. at 198–99.

In response to this evidence, Cigar City asserts that these pronouncements by Bang and Postle should only be construed as pertaining to Duncan's management style, not her gender. The flaw with this argument is that the meaning of the comments was a matter for the jury, not the Court, to decide.

The sex discrimination cases Cigar City cites which involve references to an employee being "motherly" (or words to that effect) do not dictate a contrary conclusion. (Doc. 166 at 10–12). In the first of those decisions—*Fischer v. Sentry Ins.*

19

*A Mut. Co.*—the challenged remark was made in the context of a performance review where a "motherly/fostering" supervisory approach was explicitly contrasted with another management style.  2020 WL 2575374, at *15 (W.D. Wis. May 21, 2020). And in the second case—*Hinds v. Chertoff*—the court's finding was based upon the "plaintiff's own description" of the statements.  2008 WL 360718, at *3 (W.D. Mich. Feb. 8, 2008).[4]

Here, by contrast, the characterizations of Duncan as being "motherly" were made in materially different circumstances.  For one thing, Postle testified that he never referred to any male employees as a "mother hen" (Doc. 163 at 244), and a reasonable jury could interpret this concession as undermining Cigar City's contention that the description of Duncan was gender-neutral.  For another, the comments about Duncan were not made in the context of a performance review or the banter of the workplace, but as a curt explanation for why she was not promoted.  In short, given the facts of this case, the jury was not compelled to believe that the challenged remarks about Duncan were purely related to her management style.  *See Dejong v. CompUSA, Inc.*, 2001 WL 37125216, at *3 (D.N.M. Feb. 9, 2001) (finding comments that the

---

[4] Cigar City cites a third case as well—*Davis v. Kimbel Mech. Sys., Inc.*—but there the court concluded that the statements at issue failed to rise to the level of "direct evidence" of discrimination, not that they did not constitute any evidence of discrimination at all.  322 F.R.D. 470, 489 n.16 (W.D. Ark. 2017).  It bears emphasizing in this regard that the EEOC does not claim the references to Duncan being "motherly" amount to direct evidence of discrimination.  Instead, the EEOC merely argues that the Court should not determine the meaning of those pronouncements as a matter of law.  (Doc. 180 at 11).

female plaintiff was "mothering" her subordinates was evidence of the employer's motivation to force the plaintiff out of the company because she was a woman).

The second category of additional evidence of discrimination, viewed in the light most favorable to the EEOC, is a comparison of the testimony and exhibits from which a juror could reasonably infer that Duncan was a better GM candidate than Snell.[5]  To begin, at the time Bang made the decision to promote Snell over Duncan, Duncan had worked for Cigar City for three years and at the Tampa location for two years, while Snell had been employed by Cigar City for less than a year and not at the Tampa store.  (Doc. 176 at 163).  Further, unlike Duncan, Snell did not participate in the GM training program and did not even want to be the Tampa GM.  *Id*. at 165–67.  In fact, a reasonable jury could conclude that Snell's sole impetus for accepting the job was because he believed that if he turned down the position, it would reflect negatively on him within Cigar City.  *Id*.

A reasonable jury could also draw support for the proposition that Duncan was a superior option to Snell from the fact that Hunt recommended Duncan to replace him as the Tampa GM (Doc. 178 at 268–72), and that Hunt deemed her to be more qualified to be a GM than he was (Doc. 185 at 19).  That sentiment was echoed by Hammers, who likewise testified that Duncan was better equipped to be a GM than

---

[5] As noted previously, Cigar City does not dispute that Duncan made out a *prima facie* case of discrimination, which includes a finding she established a valid comparator.  Thus, the Court addresses Cigar City's differential treatment of Duncan and Snell solely "in the context of whether that differential treatment could otherwise reasonably support an inference of discrimination."  *Willis*, 846 F. App'x at 797 n.11.

he was (Doc. 176 at 89), and by Presley, who stated that Duncan would be her top choice for GM if she owned a Harley-Davidson dealership (Doc. 162 at 202).

On the other hand, Hammers, who was Snell's supervisor at the time Snell was chosen to be the Tampa GM, testified that Snell was not a "rock star" and that Snell did not have his "stamp of approval" for the Tampa GM post.  (Doc. 176 at 91–92).  Nor was this an opinion that Hammers kept to himself.  According to his testimony, he conveyed his reservations about Snell directly to Bang when Bang asked him whether Snell was "[GM] material." *Id.*

The Supreme Court has held that testimony and exhibits regarding a plaintiff's qualifications "may suffice, at least in some circumstances, to show pretext," *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006), which is to say that such evidence can sometimes demonstrate discrimination, *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 n.1 (11th Cir. 2012) ("The opportunity provided to a plaintiff to show pretext is simply an opportunity to present evidence from which the trier of fact can find unlawful discrimination.").  Cigar City counters that for qualification evidence to substantiate a showing of pretext, the disparity in qualifications between the prevailing candidate and the rejected one must be "of such weight and significance that no reasonable person, 'in the exercise of impartial judgment, could have chosen the candidate selected.'"  (Doc. 166 at 17–18) (quoting *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (per curiam)).  Cigar City is correct that where a plaintiff "seeks to prove pretext through qualifications *alone*, the difference in

22

qualifications must be so glaring that no reasonable impartial person could have picked" the winning candidate. *Vessels*, 408 F.3d at 772 (emphasis added) (citation omitted). The Eleventh Circuit made clear in *Vessels*, however, that "where the qualifications disparity is not the *sole* basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext." *Id.* (citation omitted)

In this case, as explained above, there is evidence from which a reasonable juror could conclude that a comparison between Duncan and Snell as GM candidates reveals a qualifications disparity sufficient enough to serve as at least some evidence of sex discrimination. This is especially true in light of Snell's testimony that he did not want to be the Tampa GM. In sum, Duncan presented adequate proof to show "that [Cigar City's] proffered explanation [was] unworthy of credence." *Burdine*, 450 U.S. at 256 (citation omitted).

The third and final category of additional evidence of discrimination revolves around Bang and Postle's credibility (or lack thereof) relative to their handling of Duncan's GM candidacy. By way of example, Postle not only flatly denied he made the comments Hammers and Presley attributed to him, but he also went so far as to claim that he never conversed with Hammers about Duncan and that he never spoke to Presley about why Duncan was not promoted. (Doc. 178 at 45–50). Bang similarly denied ever discussing Duncan with Hammers, much less telling Hammers that Duncan was not going to be a GM because she was too motherly. *Id.* at 228. He

23

further denied ever saying to anyone that he did not want a "motherly" GM. *Id.* at 228–29.

By way of another example, Bang and Postle each made assertions while on the stand that seemed inconsistent with statements they made at their respective depositions. And the EEOC attempted to impeach each of them on this ground.

Assessing what weight, if any, to afford testimony like that offered by Bang and Postle on the question of Duncan's promotion is the responsibility of the jury. *See Reeves*, 530 U.S. at 150 (noting that "[c]redibility determinations" are "jury functions, not those of a judge"). Construing the evidence in the light most favorable to the EEOC, the jury could have reasonably found that Bang and/or Postle were not being truthful, which would have entitled them to infer that Bang and/or Postle were also prevaricating when they testified that Duncan's sex had nothing to do with why she was not elevated. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194 (11th Cir. 2004) (stating that once a decisionmaker's "credibility is damaged, the jury could infer" on that basis that the decisionmaker made the adverse employment decision not because of the reason(s) it proffered but because of discrimination).

One last point bears mentioning regarding Cigar City's challenge to the sufficiency of the evidence on the issue of liability. In its renewed motion, Cigar City references each piece of testimony or documentary proof that could buttress the jury's liability finding as if it were to be viewed in isolation, seemingly asking the Court to discern whether each such evidentiary item taken on its own is enough to uphold the

jury's determination.  But that is not the correct approach to evaluating a sufficiency challenge.  *Exel, Inc.*, 884 F.3d at 1329 (observing that, in assessing a motion for a judgment as a matter of law, a court must "consider *all* the evidence") (emphasis added) (citation omitted); *Ortiz*, 834 F.3d at 765 (noting that, in weighing the merits of a Rule 50(b) motion in an employment discrimination case, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself").

In sum, considering the entirety of the testimony and exhibits before the Court in the light most favorable to the EEOC, and construing all reasonable inferences in its favor, a reasonable jury could conclude that Cigar City unlawfully discriminated against Duncan on the basis of her sex.

## B.

Cigar City's second argument in support of its renewed motion for a judgment as a matter of law—as stated earlier—is that there is insufficient evidence to bolster the jury's punitive damages figure.  (Doc. 166 at 19–25).  Two points of clarification are necessary before deciding the merits of this challenge.  First, although the jury awarded $500,000 in punitive damages to the EEOC, Title VII caps such damages at $200,000 given the number of individuals Cigar City employed during the pertinent time frame. (Doc. 165 at 2–3).  The EEOC does not claim otherwise.  (Doc. 181 at 2).

Second, Cigar City originally contended that the jury's punitive damages finding could not stand in the absence of an award of compensatory damages and that

the punitive damages figure was excessive in any event.  (Doc. 165).  Cigar City has since abandoned these contentions.  (Doc. 191).

Having disposed of these preliminary items, the Court turns to Cigar City's challenge to the jury's reduced punitive damages figure.  (Doc. 166 at 19–25).  This challenge fails for a number of reasons.

As an initial matter, Cigar City is procedurally barred under Rule 50 from making this claim in its renewed motion.  As the Eleventh Circuit has explained in this respect, a motion for judgment as a matter of law pursuant to Rule 50(a) must "'specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment[,]'" and while the "motion can be renewed after trial under Rule 50(b), . . . a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion."  *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1245 (11th Cir. 2001) (quoting Fed. R. Civ. P. 50(a)(2) and citing *Litman v. Mass. Mut. Life Ins. Co.*, 739 F.2d 1549, 1557 (11th Cir. 1984)); *see also Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 902 (11th Cir. 2004) (finding that a district court "clearly erred because it lacked authority to enter judgment under Rule 50(b) for the defendants on a ground not raised prior to the submission of the case to the jury").

Here, Cigar City failed to mention punitive damages in their motion for judgment as a matter of law under Rule 50(a), much less make an argument that there was not satisfactory evidence to support a punitive damages award.  (Doc. 185 at 68–

75).  As a result, Cigar City is foreclosed from raising this contention in their renewed motion under Rule 50(b).

Even were that not the case, Cigar City's sufficiency challenge is without merit in any event.  Title VII authorizes punitive damages for intentional employment discrimination if the employee—or the EEOC on behalf of the employee—demonstrates that the employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to the [employee's] federally protected rights."  42 U.S.C. § 1981a(b)(1); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) ("With the passage of the 1991 [Civil Rights] Act, Congress provided for additional remedies, including punitive damages, for certain classes of Title VII . . . violations.").  "Malice means an 'intent to harm' and recklessness means 'serious disregard for the consequences of [one's] actions.'"  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1280 (11th Cir. 2008) (quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 476 (11th Cir. 1999)).  To be liable for punitive damages under section 1981a, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law."  *Kolstad*, 527 U.S. at 536.  Section 1981a, however, "does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind[, n]or does the statute's structure imply an independent role for 'egregiousness' in the face of congressional silence."  *Id*. at 535.

In an attempt to escape the strictures of section 1981a, Cigar City asserts that there is not a satisfactory evidentiary basis for a reasonable jury to find that Bang

"engaged in a pattern of discrimination, acted with spite or malevolence, or acted in blatant disregard for civil obligations."  (Doc. 166 at 22).   The problem with this argument is that Bang, who was Cigar City's Vice-President and the final decisionmaker as to whether Duncan was to be promoted, testified he was aware that "discrimination against women in the promotion process is against the law."  (Doc. 178 at 119).   Furthermore, there was evidence that undermined Cigar City's proffered, nondiscriminatory rationale for not elevating Duncan and that demonstrated male GM candidates received more favorable treatment.   Moreover, Bang and Postle both made statements indicating that they would be unwilling to advance Duncan to the GM post due to her gender (i.e., because she was too "motherly") and then later denied making those comments at trial.[6]   Taken together, and viewed in the light most favorable to the EEOC, this testimony and other evidence are sufficient to uphold the jury's punitive damages award.  *See E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 612 (11th Cir. 2000) (finding that adequate evidence of intentional discrimination plus "evidence tending to show that" defendants knew the discrimination at issue "violated federal law" was enough to buttress a punitive damages award against the defendants) (citation omitted); *Austrum v. Fed. Cleaning Contractors, Inc.*, 190 F. Supp. 3d 1132, 1135 (S.D. Fla. 2016) ("[A decisionmaker's] knowledge that it is illegal to treat applicants for employment differently based on race, coupled with credible evidence that he

---

[6] For the reasons stated above, the Court does not find as a matter of law that these comments were gender neutral.

28

intentionally did so, is sufficient for a reasonable jury to find that he acted with malice or reckless disregard for [the plaintiff's] federally-protected rights.") (citing *Lambert v. Fulton Cnty.*, 253 F.3d 588, 597 (11th Cir.2001)).

III.

The final matter before the Court is the EEOC's motion for non-monetary injunctive relief, which the EEOC maintains is necessary "to ensure that unlawful sex discrimination in hiring and promotion does not recur at [Cigar City's] Harley-Davidson dealerships throughout Florida." (Doc. 156).  The specific injunctive relief the EEOC requests covers a period of three years and includes the following terms: (1) a "general injunction" prohibiting Cigar City from discriminating against female employees, applicants, and former employees in the hiring and/or promotion to the GM position at any of the Cigar City dealerships; (2) a requirement that Cigar City notify any purchasers, successors, or assigns of the Court's award of injunctive relief; (3) the adoption and implementation of written policies relating to the prevention of sex discrimination in the hiring and promotion of individuals to the GM position; (4) the appointment of an independent injunctive relief manager to perform various tasks designed to guarantee Cigar City's compliance with the Court's injunction; (5) the provision of in-person annual training to employees by the injunctive relief manager to address, *inter alia*, Cigar City's policies regarding sex discrimination in the hiring and promotion of individuals to the GM position, as well as the type of conduct that may constitute unlawful discrimination, such as sex stereotyping and the improper

consideration of sex in hiring decisions; (6) the posting of a "Notice of Court Order" regarding the jury's verdict and the approved injunctive relief in all Cigar City dealerships in areas accessible to the public and its employees; (7) regular reporting by the injunctive relief manager to the EEOC relative to Cigar City's adherence to the terms of the injunction; (8) the right of the EEOC at any time to review Cigar City's compliance with the terms of the injunction by requesting information and documents; (9) the right of the EEOC at any time up to and including three months after the end of the compliance period to ask the Court to remedy any breach of the injunction without any objection from Cigar City to either the Court's jurisdiction or the EEOC's ability to bring such an enforcement action; and (10) authorization for the EEOC to recover its reasonable costs incurred in proving a violation of the injunction, along with any other relief deemed proper by the Court. (Doc. 202).

It is well established that when the EEOC initiates an enforcement action, it may "seek[ ] to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 295–96 (2002). Consistent with this principle, the Eleventh Circuit has held that when a plaintiff proves discrimination, injunctive relief is warranted unless the defendant proves there is no reasonable possibility of further noncompliance with the law. *U.S. E.E.O.C. v. Fed. Express Corp.*, 180 F. App'x 865, 867 (11th Cir. 2006) (per curiam) ("'[T]he EEOC is normally entitled to injunctive relief where it proves discrimination against one employee and the employer fails to

prove that the violation is not likely to recur.'") (per curiam) (quoting *U.S. E.E.O.C. v. Massey Yardley*, 117 F.3d 1244, 1253 (11th Cir. 1997)); *see also* 42 U.S.C. § 2000e–5(g)(1) ("If the court finds that the [defendant] has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may enjoin the [defendant] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate. . . .").

A court ultimately has broad discretion in determining whether, and the extent to which, injunctive relief should be imposed. *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 879–80 (11th Cir. 1986) (citations omitted). That discretion is not unbounded, however. Instead, an award of injunctive relief must be fashioned only "so far as possible [to] eliminate the discriminatory effects of the past as well as bar *like discrimination* in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (internal quotation marks and citation omitted; emphasis added). In other words, in a sex discrimination lawsuit such as this one, the injunction should be "*reasonably tailored* to address deficiencies in [the defendant's challenged] policies, inform and train employees regarding the relevant law, and prevent similar conduct from recurring" in the future. *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 469–70 (5th Cir. 2013) (emphasis added); *see also E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1579 (7th Cir. 1997) (finding that "the district court did not abuse its discretion in granting injunctive relief *narrowly tailored* to the discrimination proven by the Commission") (emphasis added).

31

Here, as noted, the jury entered a verdict finding that Cigar City discriminated against Duncan and did so with either malice or reckless indifference to Duncan's federally protected rights. (Doc. 145). The EEOC has therefore satisfied the first element necessary for an award of injunctive relief.

As for the second element, Cigar City fails to show that there is no reasonable possibility of further noncompliance with the law. In an effort to demonstrate otherwise, Cigar City points out, *inter alia*, that it hired a female GM during the pendency of the lawsuit, although it later fired her for dishonesty before the trial commenced. (Doc. 171 at 17–18). Cigar City also purports that there is an absence of proof of recurrent violations and asserts that changes to its policies would not have prevented discrimination, nor would teaching about stereotypes. *Id.*

The evidence before the Court, however, reveals that Bang remains the Vice-President of Cigar City's multiple locations, that he continues to act as the sole decisionmaker for the GM vacancies, and that he has not been disciplined for what the jury determined was discriminatory conduct. *Massey Yardley*, 117 F.3d at 1254 (holding a district court abused its discretion in denying all equitable relief and failing to provide any reasons for doing so, where "[t]he discriminatory conduct [at issue] was primarily that of [two individuals], both of whom remain[ed] in the same supervisory positions at the dealership without, so far as [could] be ascertained, having been disciplined for their behavior" and "no one at the company seem[ed] to have admitted to any wrongdoing"); *Ilona*, 108 F.3d at 1579 ("[I]njunctive relief is justified in a case

like this where the individuals who were found to have discriminated remain the defendant's primary [decisionmakers].") (citation omitted); *E.E.O.C. v. Exel, Inc.*, 2014 WL 12538889, at *2–3 (N.D. Ga. Mar. 13, 2014) (concluding that the defendant failed to demonstrate a Title VII violation was unlikely to recur where the record showed the discriminatory conduct at issue was primarily attributable to one of the defendant's employees who remained in a management position, there was no evidence that the employee was sanctioned for his behavior, and the defendant had not admitted to any wrongdoing) (citation omitted); *cf. U.S. E.E.O.C. v. Fed. Express Corp.*, 180 F. App'x 865, 867 (11th Cir. 2006) (holding that the district court did not abuse its discretion in denying injunctive relief after finding the discriminatory conduct was not likely to reoccur where it was committed by a single manager who was no longer employed). While Cigar City has since promoted at least one woman to a GM position, the timing of such an appointment after the EEOC's charge in this action mitigates its effect (Doc. 178 at 245–47), as does Cigar City's lack of an acknowledgment of wrongdoing or any offer by it to make any changes to the GM hiring process in response to the verdict.

The fact that the EEOC is entitled to any injunction, however, does not end the inquiry.  The question the Court must then address is what the contours of that relief should be.  In response to the EEOC's proposal described above, Cigar City expresses a willingness to accede to certain terms if the Court finds that an injunction to be appropriate.  It contends though that the majority of the conditions sought by the EEOC are not properly tailored to the circumstances of this case, i.e., a finding of

33

discrimination against a single employee.  (Docs. 171, 203).  The Court agrees with Cigar City in part and notes that the cases upon which the EEOC relies in support of the contested terms in its proposed injunction involved more egregious or otherwise inapposite factual scenarios.  Two examples will suffice to illustrate this point.

The first is *E.E.O.C. v. Danny's Restaurant, LLC*, 2021 WL 3622139 (S.D. Miss. Aug. 16, 2021), which the EEOC highlights to buttress, among other suggested conditions, its request for the appointment of an injunctive relief manager.  *See* (Doc. 156 at 12–13; Doc. 202-1 at 2–12).  In *Danny's Restaurant*, the court found that the defendant—a cabaret—had for years subjected multiple Black women to disparate terms and conditions of employment based upon their race in violation of Title VII. *Id*.  In deciding the nature and scope of the injunctive relief to be awarded, the court observed that "there was extensive testimony regarding [the d]efendant's willful non-compliance with Title VII despite the EEOC's many attempts to eradicate discrimination at [the c]abaret."  *Id*. at \*2.  This included evidence that the "[d]efendant continued to discriminate against its Black employees [even though the defendant] sign[ed] three Consent Decrees explicitly forbidding said discrimination." *Id*.  The court also noted that the cabaret did not object to the appointment of an injunctive relief manager, nor did it oppose much of the other injunctive relief sought by the EEOC.  *Id*.  Needless to say, the circumstances present in *Danny's Restaurant* cannot be fairly equated to those that exist in this case.

The second example is *E.E.O.C. v. Favorite Farms, Inc.*, No. 8:17-cv-1292-JSM-AAS, which the EEOC references to bolster a number of the terms in its sought-after injunction, including—again—the use of an injunctive relief manager.   In *Favorite Farms*, the EEOC brought hostile work environment claims under Title VII that were predicated on sex and retaliation.  *Id.*, (Doc. 226).  At trial, the court heard testimony from a female seasonal laborer that she was raped by her male supervisor when he came over to "inspect" the apartment which the woman's employer—a strawberry farm—had provided for her and her children.  *Id.*  According to the evidence, the male supervisor worked in the fields with this woman and was also responsible for assigning the woman and other field laborers to housing units operated by the farm.  *Id.*

The court in *Favorite Farms* additionally heard testimony from a second woman that the same male supervisor approached her several years earlier and pressured her to have a sexual relationship with him.  *Id.*  According to this second female, the supervisor threatened that he would fire her and force her to move out of her apartment if she did not give in to his demands.  *Id.*  Despite the fact that the woman thereafter reported this conduct to the farm, the male supervisor continued to oversee her and the "other female field laborers[,] kept the keys to their housing, inspected their housing, and received no training."  *Id.*  Unwilling to work under such a difficult situation, the second female felt it necessary to quit her job.  *Id.*

Not only are the facts of *Favorite Farms* materially distinguishable from this action, so too is the relief.  In addressing the particulars of the injunction to be imposed

in that lawsuit, the court did not appoint an injunctive relief manager with the type of duties sought by the EEOC in this case.  *Id.*, (Doc. 277).  Instead, it directed that a singular training session on sexual harassment and retaliation be performed by an independent subject matter expert mutually agreed upon by the EEOC and the farm. *Id.*  In short, *Favorite Farms* is of little help to the EEOC here.[7]

Having considered each of the EEOC's specific requests for injunctive relief, Cigar City's response to same, the authority cited by both sides, the evidence adduced at trial, and the matters raised in the post-trial hearings on the EEOC's motion, the Court will issue a separate judgment granting some, but not all, of the injunctive relief sought by the EEOC.

IV.

In light of all the above, it is hereby ORDERED:

1.      The parties' respective *ore tenus* motions for a judgment as a matter of law (Docs. 146, 147) are denied.

2.      The *Defendants' Renewed Motion for Judgment as a Matter of Law* (Doc. 166) is denied.

---

[7] Other decisions cited by the EEOC are similarly unhelpful.  Prime among these is *E.E.O.C. v. Fla. Commercial Sec. Servs. Corp.*, No. 1:13-cv-20465-JJO (S.D. Fla. Dec. 8, 2014), which was an American with Disabilities Act action.  (Doc. 202-1).  One of the issues with the EEOC's reliance on *Florida Commercial* is that while the injunctive relief authorized in that case includes many of the provisions requested here, the court in *Florida Commercial* did not provide any analysis as to why the terms it adopted were reasonably tailored to the facts before it.  It appears from a review of the docket that this was because the defendant in the suit did not oppose any of the suggested terms and, in fact, did not even file a response to the EEOC's motion for injunctive relief.

3.      The *Plaintiff's Post-Trial Motion for Injunctive Relief* (Doc. 156) is granted in

part and denied in part for the reasons described herein and as reflected in the

separately issued judgment of injunctive relief.

SO ORDERED in Tampa, Florida this 5th day of April 2023.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record